Filed 8/5/26  Marriage of Bridges CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of LEIGH and ROBERT BRIDGES. | |
| LEIGH A. BRIDGES, | F088836, F088838, F088841 |
| Respondent, | (Super. Ct. No. BFL-21-004202) |
| v. | |
| ROBERT A. BRIDGES, | **OPINION** |
| Appellant. | |

APPEAL from orders of the Superior Court of Kern County.  Jason Webster, Judge.

Moran Law Firm, Amanda K. Moran and S. Eric Bishop II for Appellant.

Klein, DeNatale, Goldner, Cooper, Rosenlieb & Kimball and Catherine E. Bennett for Respondent.

-ooOoo-

In this consolidated proceeding, Robert Bridges appeals from three orders made by the trial court following a contested hearing.  First, he challenges the trial court's imposition of a five-year domestic violence restraining order prohibiting him from contacting Leigh,

his former spouse, and their two children.[1]  Second, the court's determination that Leigh is entitled to credit of $172,224 for her share of a portion of restricted stock units (RSU) liquidated by Robert, and temporary support arrears of $142,002.69.  Finally, he asserts the court abused its discretion by awarding $159,669.44 in fees to Leigh's attorney.[2]

We find no error with the trial court's imposition of a five-year domestic violence restraining order (DVRO), its determination that Robert owes Leigh temporary support arrears of $142,002.69, or the $159,669.44 in attorney's fees awarded to Leigh's attorney.  However, we conclude the determination that Robert pay one-half value of the liquidated RSUs awarded to Leigh is an interlocutory order, and therefore not appealable.  As a result, we do not reach the merits of that claim and dismiss that portion of Robert's appeal.  We otherwise affirm the trial court's orders.

## FACTUAL AND PROCEDURAL HISTORY

On November 9, 2021, Leigh filed for legal separation after approximately 17 years and nine months of marriage.  She and Robert share two sons together, L.B. and G.B.  Leigh requested sole physical and joint legal custody of their children, spousal support, attorney's fees, and a determination of community and quasi-community property rights.

---

[1]  The parties will hereafter be referred to by their first names, not out of any familiarity or disrespect, but because that is the accepted practice in family law cases.  (See, e.g., *In re Marriage of Schaffer* (1999) 69 Cal.App.4th 801, 803, fn. 2.)

[2]  The trial court's ruling on the DVRO was assigned case No. F088836, its ruling on the temporary support arrearages and attorney's fees was assigned case No. F088841, and the order allowing Robert to cash RSUs to pay those arrears (the enforcement order) was assigned case No. F088838.  Robert's notices on each matter attached only the corresponding minute orders rather than the formal written orders entered thereon.

Robert acknowledges this potential defect and requests that the notices be liberally construed under California Rules of Court, rule 8.100(a)(2), to be taken from the operative written orders.  Each notice identifies the underlying rulings to date, no prejudice or confusion as to the scope of the appeals results, and the appeals are properly construed as taken from formal orders.  We therefore accept his request to construe the notices of appeals liberally.  The appeals are treated throughout this brief as taken from the orders thereon.

On December 2, 2021, Robert filed for a dissolution of the marriage, seeking sole physical custody and joint legal custody of the children and adjudication of community and quasi-community assets and debts. He agreed that spousal support was payable to Leigh.

On February 3, 2022, Leigh filed a request for a DVRO against Robert pending a hearing.

On February 9, 2022, the court issued a temporary restraining order (TRO) against Robert.

On August 31, 2022, the trial court addressed various support issues at a hearing. Leigh sought temporary child and spousal support pending resolution of the dissolution proceedings.[3] Leigh's trial counsel presented a DissoMaster[4] calculation with an *Ostler-Smith*[5] order, requiring Robert to disclose any income he receives above his base income, to provide a copy of his paycheck to her, and to pay any additional support owed within 10 days.

On July 7, 2023, following a dispute about the support order, the trial court ruled that child and spousal support would be retroactive to January 15, 2022.

---

[3] "A temporary order is intended to allow the supported spouse and children to live in their ' " 'accustomed manner' " ' pending the ultimate disposition of the action. [Citation.] 'The order is based on need and is not an adjudication of any of the issues in the litigation.' " (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 637.)

[4] "DissoMaster is a computer software program widely used by courts to set child support and temporary spousal support." (*Namikas v. Miller* (2014) 225 Cal.App.4th 1574, 1578, fn. 4.)

[5] *In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33 (*Ostler-Smith*), held that spousal and child support awards may include both a percentage of the supporting spouse's wages and a percentage of the income he or she receives in the form of bonuses, dividends and other types of discretionary compensation. An *Ostler-Smith* provision is thus " 'an additional award, over and above guideline support,' " meant to "capture fluctuations in the supporting spouse's income …." (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 949.) "Case law justifies an *Ostler/Smith* award 'on the ground that future bonuses are not guaranteed, and it would be unfair to require the obligor to file motions for modification every time a bonus is reduced [or denied].' " (*Ibid.*)

On August 30, 2023, Leigh filed a request to enforce the support orders with sanctions.

On April 29, 2024, the court granted a request filed by Leigh for joinder of Robert's employee stock account.

On May 21, 2024, the trial court granted, in part, an emergency request by Leigh seeking to freeze Robert's shares of employee stock in the California Resource Corporation. Leigh alleged that Robert had liquidated RSUs that were potentially community property, and that the only way to protect her interests in those assets would be to freeze the account.

On June 20, 2024, at a hearing, the court granted both parties access to 529 savings plans established for the children, granted L.B. access to his 529 savings plan, and ordered Robert to make school tuition payments for G.B. The freeze imposed on the stock account remained in effect.

On August 27, 2024, following multiple continuances, a contested hearing was held on Leigh's request for an order to enforce the temporary support orders, the DVRO, and her request for attorney's fees. At the conclusion of the hearing, the court issued a five-year DVRO protecting Leigh and the children and took the remaining issues under submission.

On September 11, 2024, the court issued additional rulings addressing the support arrears, RSUs, and attorney's fees request. The trial court specifically ordered Robert to pay $142,002.69 in arrears for temporary child and spousal support, $172,224 as one-half of the value of RSUs liquidated by Robert postseparation, and $159,669.44 in fees for Leigh's attorney, less $25,000 for prior payments.[6]

On September 19, 2024, the court issued a modified order, directing Robert to make a one-time withdraw from his RSU account to pay monies to Leigh as directed under its September 11th ruling.[7]

---

[6]     The order was signed on September 20, 2024.

[7]     This order was signed on October 2, 2024.

4.

## DISCUSSION

I. THE FIVE-YEAR DOMESTIC VIOLENCE RESTRAINING ORDER

Robert challenges imposition of a five-year restraining order prohibiting him from contacting Leigh and their children. He asserts there is insufficient evidence showing he disturbed Leigh's peace within the meaning of the Domestic Violence Prevention Act (Fam. Code,[8] § 6200 et seq.; DVPA). We find substantial evidence supports imposition of the order and reject Robert's assertion to the contrary.

*A. Background*

On February 3, 2022, Leigh filed a request for a DVRO seeking protection for herself and the children from Robert. Her request was based primarily on an incident that occurred on the evening of January 19, 2022, when Robert forcefully entered the family home, breaking a secondary lock on the front door. However, after the parties' separation in June of 2021, Leigh alleged that Robert had made multiple unannounced visits to the family residence, even though he had moved out, was living in his own apartment, and did not have permission to be on the property.

The record reflects the following conduct by Robert both before and after the TRO issued:[9]

### 1. Conduct Prior to the Issuance of the TRO

On September 6, 2021, while Leigh and the children were out of town, Robert entered the family residence to retrieve cable boxes and a computer. L.B. texted his father about the missing items and accused his father of changing passwords to various

---

[8] All undefined statutory citations are to the Family Code unless otherwise indicated

[9] Robert provides an alternative explanation for some of the following events, including a version of the January 19, 2022 incident based on his own declaration, submitted in the trial court below. However, as Robert acknowledges, in reviewing the trial court's ruling, we review all facts in favor of the court's ruling. (*M.S. v. A.S.* (2022) 76 Cal.App.5th 1139, 1144.) We therefore do not recite his version of events, and we recount only those contacts between the parties most relevant to the DVRO.

entertainment accounts to which the family was subscribed, including Netflix and Disney+. L.B. told his father, based on his conduct, he did not feel safe at the house anymore.

Sometime that same month, Robert came to the family residence and attempted to show L.B. a photograph depicting a male subject in his underwear. Robert represented that the male depicted in the photograph was Leigh's boyfriend.

On December 24, 2021, while Leigh and the children were away, Robert entered the family home and left Christmas presents inside. The following day, Robert sent a text message in a group family text chat about picking up the boys. G.B. told his father he was having a panic attack at the thought of having to visit him because of Robert's unannounced visits.

On December 29, 2021, G.B. attended a hockey game with his best friend, and his best friend's father, Sam. Robert also attended this game, and a verbal confrontation ensued between Sam and him. After Sam refused to let G.B. leave with Robert, Robert and Sam exchanged words, and security had to intervene.

On January 13, 2022, after another unannounced visit, Robert messaged Leigh about a broken sprinkler on the family property and told her that he would fix it. Leigh instructed Robert not to step foot onto the property.

On January 19, 2022, at approximately 11:00 p.m., Robert entered the family residence, broke a secondary lock Leigh had installed, and moved from room-to-room through the residence. Leigh asserted that Robert's conduct frightened G.B., who pushed Robert with a hockey stick to stop him from storming through the house. Video evidence depicting the incident showed that Leigh asked Robert to leave multiple times. Leigh contacted the sheriff's department.

Earlier that evening, L.B. told his father that he would be spending the night at his grandparents' home. Robert repeatedly questioned L.B. why he was staying the night there. L.B. informed his father that everything was okay. Following the incident, Robert told L.B. that he came to the family residence to find out why L.B. was staying at his grandparents'

house that night. L.B. implored his father to accept the divorce and asked him to "please stop" his behavior. L.B. told his father not to text him.

On January 29, 2022, Robert returned to the family residence. He entered the backyard and accessed the home through a side door. Leigh expressed frustration that Robert's unannounced visit had frightened L.B. Robert stated that both he and Leigh had a right to be at the family residence. Leigh told Robert that he was not welcome at the residence. In a family text message chain, Robert accused Leigh of having an affair and manipulating the children.

On January 30, 2022, Robert sent a message in the family group chat attempting to set up a time for him to come over and put away Christmas decorations. Leigh declined Robert's help and stated she would handle it. She advised Robert that the sheriff's department advised her to change the locks on everything, and that their advice was consistent with that of her attorney. Robert stated that the sheriff's deputies were "wrong about the law" and that they both owned the house.

In addition to Robert's unannounced visits to the family residence, Leigh also accused Robert of changing passwords to family accounts and setting the multi-factor authentication to his accounts so that she could not reset passwords, using electronic surveillance devices and various accounts to stalk her, and manipulating their joint bank accounts so that she would not have adequate access to funds.

Leigh also accused Robert of maligning her, citing an earlier occasion when she asked Robert to take the children to school because she was ill with Valley Fever. When she sent Robert photographs of her skin to prove that she was ill, he told some of his employees that Leigh had contracted a sexually transmitted disease acquired from an affair.

On February 9, 2022, the court issued a TRO protecting Leigh and the children from Robert. The TRO limited contact between the parties and required that any communication be brief and related to the children.

### 2.    Conduct Post-TRO

In the years that followed the issuance of the TRO, Leigh messaged Robert on the My Family Wizard application to discuss logistical matters, including the payment of expenses and household items. Robert, in turn, sent Leigh numerous unrelated messages through the application, including pictures and statements reflecting his continued emotional attachment to the family, accusations about alleged affairs Leigh had during the marriage and romantic relationships she had allegedly has postseparation, Bible verses, and requests to reconcile. Leigh repeatedly informed Robert that he was in violation of the TRO and accused him of harassment.

On July 9, 2022, Leigh received a typewritten letter in which Robert asked to reconcile.

On September 10, 2022, Robert messaged Leigh asking her if she was with "Paul" now and expressing concerns about her safety given Paul's past relationship and history of alleged domestic violence. Robert sent her another message questioning why she would be with Paul. Leigh responded, addressing Robert's allegations and advised him that he was in violation of the restraining order. Robert replied, raising concerns about Paul's alleged substance abuse. Leigh reminded Robert again that he was in violation of the restraining order. They continued to message one another about Robert's accusations.

On September 16, 2022, Leigh messaged Robert, requesting that he pay for new tires for one of their vehicles. Robert insisted on coming to the tire facility where Leigh was, to pay in person, despite Leigh insisting he pay over the phone because of the restraining order. Robert declined to pay over the phone, accusing Leigh and Paul of using one of his credit cards to commit fraud. After further discussions, Leigh stated she would pay for the tires herself.

On October 24, 2022, Robert messaged Leigh about a complaint made by her neighbor. After several messages back and forth, in which Robert failed to provide the

8.

complainant's contact information, Robert stated that after what Leigh and Paul did, he and Leigh would have to communicate only through their attorneys.

On November 2, 2022, Robert messaged Leigh, informing her that he still loved her.

On January 19, 2023, Robert walked closely to Leigh's vehicle as she was running an errand near Robert's workplace. He stared at her as he passed. Robert messaged Leigh to say he had seen her. He added that he would speak to his security team about her presence near his workplace and that he would file a police report against her for taking G.B. out of state without permission. Leigh responded, informing Robert that she was making a car payment at a nearby credit union, and that he was in violation of the restraining order. Leigh added that Robert's behavior scared her.

On March 16, 2023, Robert messaged Leigh, asking her if she was moving his possessions, and why moving vans were parked in front of the family residence. Robert also called Leigh's mother to inquire about his possessions. After Leigh asked Robert to leave her alone, he asked if they could talk.

On March 18, 2023, Robert sent Leigh a message with a passage from I Corinthians in the Bible. (1 Corinthians 13:4, King James Version.) He messaged her again asking if she would like to talk. The following day, he messaged again asking if they could talk.

On August 24, 2023, Robert messaged Leigh about the children and asked her about another alleged boyfriend. He also accused her of attempting to move to Canada because she had recently applied for passports for the children.

On September 16, 2023, Robert accused Leigh of having a new boyfriend. He stated that he had proof that he would provide to his attorney and added, "[h]ope your fat boyfriend can run."

Between October 26, 2023, and October 29, 2023, Robert sent Leigh multiple pictures, including photographs of the two of them together, presumably taken during the marriage, Leigh depicted with an unknown subject, and photographs of the children when they were younger.

9.

The TRO was extended multiple times until August 27, 2024, when the five-year permanent restraining order was issued by the trial court following a contested hearing on October 3, 2023, and August 27, 2024.

### 3. *The Testimony of L.B. and G.B.*

On June 7, 2023, G.B., 14 years old at the time, testified that Robert's uninvited visits to the family residence scared the family. G.B. recalled that during his parent's marriage, Robert would initiate arguments culminating in Robert "yelling at the top of his lungs."[10] He stated that he did not want a relationship with his father, he did not want his father to attend his hockey games or practices, and he declined his father's request to attend his (G.B.'s) high school graduation. According to G.B., he was not ready for a face-to-face relationship with his father.

On the other hand, L.B., 17 years old at the time, believed it would be beneficial for him to have discretion to see his father. He expressed concerns about his father's actions and lack of accountability but stated that he was not afraid of his father.

### 4. *The Trial Court's Ruling on the DVRO*

The minute order reflects the following findings by the court following the contested hearing:

> "The Court finds good cause to issue a domestic violence restraining order.
>
> "The Court finds that Leigh Bridges is an appropriate protected party and Robert Bridges is an appropriate restrained party. The Court finds that the parties' children [L.B.] and [G.B.] are appropriate additional protected parties.
>
> "The Court finds that disturbing the peace has occurred from the specific evidence of Respondent breaking the chain to the door and the video evidence of Respondent refusing the leave the home in addition to the numerous violations of the temporary order."

---

[10] L.B. and G.B.'s testimony, made during a chambers' conference, was submitted as part of Robert's proposed settled statement.

The court prohibited Robert from contacting Leigh, imposed 100-yard stay-away restrictions, with narrow exceptions for brief, peaceful communication and exchanges related to court-ordered visitation, and granted Leigh control of the family residence. The court denied Robert's request to shorten the restraining order's duration.

*B. Applicable Law and Standard of Review*

The DVPA permits a trial court to issue a DVRO "to provide for a separation of the persons involved in ... domestic violence" (§ 6220) upon "reasonable proof of a past act or acts of abuse." (§ 6300, subd. (a).) Past abuse must be proven by a preponderance of the evidence. (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116; *In re Marriage of Davila and Mejia* (2018) 29 Cal.App.5th 220, 226.)

" 'Domestic violence' " is "abuse perpetrated against" a spouse or child of a party, among others. (§ 6211.) " '[A]buse' " means (1) "[t]o intentionally or recklessly cause or attempt to cause bodily injury," (2) to "[s]exual[ly] assault," (3) "[t]o place a person in reasonable apprehension of imminent serious bodily injury to that person or to another," or (4) "[t]o engage in any behavior that has been or could be enjoined pursuant to Section 6320." (§ 6203, subd. (a).)

Section 6320 permits a court to enjoin a party from "molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, credibly impersonating ..., falsely personating ..., harassing, telephoning, ... destroying personal property, contacting, either directly or indirectly, by mail or otherwise, coming within a specified distance of, *or disturbing the peace of the other party*." (Italics added.) " '[D]isturbing the peace of the other party' " is "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) Such conduct includes, "but [is] not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (*Ibid*.)

Protection may be granted to "any person described in Section 6211" (§ 6301, subd. (b)), including a "spouse or former spouse" (§ 6211, subd. (a)), and may issue to protect

11.

both the petitioner and, "on a showing of good cause, … other named family or household members." (§ 6320, subd. (a).)

"The Legislature designed the DVPA ' "to be exercised liberally," ' which is reflected by the statute's relatively low standard of proof that requires only ' "reasonable proof" ' of at least one past act of abuse." (*K.T. v. E.S.* (2025) 109 Cal.App.5th 1114, 1128 (*K.T.*); *Curcio v. Pels* (2020) 47 Cal.App.5th 1, 11 [the "DVPA 'confer[s] a discretion designed to be exercised liberally, at least more liberally than a trial court's discretion to restrain civil harassment generally' "].)

We review an order granting a restraining order under the DVPA for abuse of discretion. (*K.T., supra,* 109 Cal.App.5th at p. 1126; *In re Marriage of D.S. & A.S.* (2023) 87 Cal.App.5th 926, 933.) "To the extent we are called upon to review the court's factual findings, we apply the substantial evidence standard of review." (*K.T.,* at p. 1127; see *Bailey v. Murray* (2024) 102 Cal.App.5th 677, 684.) "In reviewing the evidence, we examine the entire record to determine whether there is any substantial evidence to support the trial court's findings. [Citation.] We do not determine credibility or reweigh the evidence." (*K.T.*, at p. 1127; see *Parris J. v. Christopher U.* (2023) 96 Cal.App.5th 108, 116.) Moreover, "we resolve all conflicts in the evidence in [Leigh's] favor and indulge all reasonable, legitimate inferences in favor of upholding the trial court's order." (*McCord v. Smith* (2020) 51 Cal.App.5th 358, 364.)

*C. Analysis*

Under the DVPA, reasonable proof of even just one past act of abuse, which includes disturbing the peace of the victim, may be sufficient to warrant issuance of a restraining order. (*K.T., supra*, 109 Cal.App.5th at p. 1128.) The instant record reflects substantial evidence demonstrating that the January 19, 2022 incident constituted an act of abuse within the meaning of the DVPA.

Robert entered the family residence late at night by breaking a secondary lock on the door. The incident was supported by partial video evidence, photographs of the broken

lock, text messages referencing the incident, and Leigh's declaration, all of which established that his conduct destroyed Leigh's mental and emotional calm within the meaning of section 6320.

Robert resists this conclusion on two grounds. First, he argues that he owns the family residence with Leigh, and that the house is presumptively community property. Ownership is not coextensive with possession. Whatever possessory interest Robert retained postseparation, he had already moved out of the family residence, and his forcible late-night entry was both uninvited and distressing.

Second, Robert maintains that he came to the family residence to "check on [L.B.]," and "had no ulterior motives related to Leigh." The record undercuts that assertion. L.B. had told his father that he was staying at his grandparents' and that everything was fine. Robert therefore had no reason to believe that L.B. was at the residence, let alone in any condition warranting a welfare check. Robert's decision to drive to the family residence at 11:00 p.m. at night, on the information he was given, supports an implied finding that his stated purpose was pretextual.

In any event, Robert's stated reasons for entering the family residence do not bear upon whether his conduct constituted abuse under the DVPA. The statute defines "disturbing the peace" as "conduct that, based on the totality of the circumstances, destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) The inquiry centers on the effect of the conduct on the protected party, not on the restrained party's asserted motivation. (*Perez v. Torres-Hernandez* (2016) 1 Cal.App.5th 389, 399.) Whether Robert subjectively believed he was entitled to enter the residence is therefore immaterial.

We further observe that the trial court did not consider Robert's conduct in isolation but rather considered his repeated violations of the TRO, spanning years. This pattern reflected a sustained effort to control Leigh that the restraining order failed to deter, causing Leigh to fear Robert. Robert's messages to Leigh, for example, were not limited to financial matters or the children; he repeatedly accused her of having an affair during the marriage

13.

and of entering new romantic relationships after they separated. Some of Robert's infidelity accusations were made in front of the children, who expressed frustration and anger at their father's behavior.

The inclusion of G.B. and L.B. as protected parties rests on a separate analytical track. Although the DVPA defines " 'abuse' " to include conduct that destroys the mental or emotional calm of the protected party (§§ 6203, subd. (a)(4), 6320, subd. (c)), it does not require the same showing to include a family member in a protective order. Thus, once the court found Robert abused Leigh by engaging in conduct that destroyed her mental or emotional calm, the court had discretion to include L.B. and G.B. as protected parties "on a showing of good cause." (§ 6320, subd. (a); see *M.S. v. A.S., supra,* 76 Cal.App.5th at p. 1144 ["section 6320, subdivision (a), requires only a showing of 'good cause' for the inclusion of family members or household members in a DVRO"]; *K.T., supra,* 109 Cal.App.5th at pp. 1130–1131 [Good cause " ' "includes reasons that are fair, honest, in good faith, not trivial, arbitrary, capricious, or pretextual, and reasonably related to legitimate needs, goals, and purposes" ' "].)

We conclude that the record supports the trial court's implied finding that there was good cause to include the children as protected parties, as the children were clearly affected by Robert's conduct. G.B. testified Robert would initiate arguments culminating in Robert "yelling at the top of his lungs." G.B. also stated that he did not want a relationship with his father, he did not want his father to attend his hockey games, and he declined his father's request to attend his (G.B.'s) high school graduation. According to G.B., he was not ready for a face-to-face relationship with his father.

L.B., in contrast, testified that it would be beneficial for him to have discretion to see his father. He stated that he was not afraid of his father, but he expressed concerns about his father's behavior. Indeed, L.B. told his father that his unannounced visits caused him anxiety. Thus, despite L.B.'s expressed desire to see his father, there was evidence supporting the trial court's conclusion that L.B. should be included as a protected party.

14.

Robert's conduct was cumulative and pervasive, and its effect on Leigh supported issuance of the DVRO, and the inclusion of L.B. and G.B. as protected parties. His sustained violations of the TRO further supports the order's five-year duration. On this record, we conclude that the trial court's issuance of a five-year restraining order fell well within its discretion.

II.     THE TRIAL COURT'S CHARACTERIZATION OF THE LIQUIDATED TRANCHE OF RSUS

Next, Robert challenges the trial court's order requiring him to pay Leigh $172,224, representing one-half of the proceeds from a liquidated tranche, or portion, of RSUs. The order reflects a stipulation by counsel that Leigh was owed one-half of the value of the liquidated RSU tranche. Robert nonetheless maintains the court erred by characterizing this asset as community property rather than his separate property. We conclude that the order is a nonappealable interlocutory order, and Robert's challenge to it is not properly before this court.

*A. Background*

During the marriage, Robert received RSUs from his employer. These RSUs were held in a California Resources Corporation stock account.

At the beginning of the dissolution proceedings, the parties are under automatic restraining orders prohibiting them from "transferring, encumbering, hypothecating, concealing, or in any way disposing of, any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court …." (§ 2040, subd. (a)(2)(A); *Raney v. Cerkueira* (2019) 36 Cal.App.5th 311, 321.)

On April 18, 2023, Robert's trial counsel notified Leigh's counsel that nearly 12,000 RSUs had vested and that Robert had transferred them to his Fidelity account. The letter represented that Robert could not perform any actions with respect to the stocks until May

20, 2024, and that the stocks were partially community and partially separate property, based on the dates they were acquired and vested.

On May 21, 2024, Leigh filed a temporary emergency (ex parte) order asking the court to characterize the vested stocks, and to freeze Robert's stock account until that characterization was made. Leigh's request to freeze the vested stocks was granted.

The parties filed motions contesting the characterization and apportionment of the RSUs.

By the August 2024 hearing, Leigh alleged that Robert had liquidated approximately $344,448 in RSUs, despite an automatic TRO prohibiting him from selling assets.

On September 11, 2024, the trial court ruled on pending property matters, including the temporary support arrears, the tranche of RSUs liquidated by Robert, and Leigh's request for attorney's fees. The court found that Robert owed $142,002.69 in temporary support arrears through May 2024, $172,224 for Leigh's share of the RSUs liquidated by Robert, and $159,669.44 in attorney's fees with a $25,000 credit for fees already paid.

As relevant here, the trial court's findings and order after ruling on September 11, 2024, expressly provides:

> "Community Property Order: The Court finds that the Respondent has cashed in Community Property Restricted Stock Options valued at $344,448.00. The Court orders that the Petitioner be paid her portion, $172,224.00, forthwith. This amount is to be attributed to the Petitioner at the time of trial."

The settled statement certified by the trial court reflects that the following occurred at the contested hearing on August 27, 2024:

> "The parties Counsel stipulate and agree that the support arrears according to the Ostler Smith Order are currently $142,002.69 and additionally $344,448.00 of restricted stock units were cashed in by Respondent, half of which is owed to Petitioner."

16.

On October 2, 2024, the trial court entered an enforcement order, directing Robert to make a one-time withdraw from the RSUs to pay Leigh money owed pursuant to its September 11, 2024 ruling.[11]

### B.  Appealability

Robert contends the trial court's ruling on September 11, 2024, is appealable as a collateral order because it finally determines a discrete property issue: the character and proceeds of an already-liquidated tranche of RSUs.  Although his argument is not without force, we disagree.

Under Code of Civil Procedure section 904.1, an appeal may be taken from a final judgment or from an order made independently appealable by the Family Code.  The collateral order doctrine sets forth a limited exception: When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter and directs payment of money or performance of an act, direct appeal may be taken.  (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.)  Such an order "is substantially the same as a final judgment in an independent proceeding."  (*Ibid.*)

The collateral order doctrine is however narrow.  It reaches only orders that are " 'truly "distinct and severable from the subject matter of the litigation" ' " and excludes orders that constitute "a necessary step to the ultimate division of the parties' entire marital estate."  (*In re Marriage of Grimes & Mou* (2020) 45 Cal.App.5th 406, 419 (*Grimes & Mou*).)  The order here fails to clear that threshold for two reasons.

First, the order addressing the liquidated RSUs is not collateral.  Such an order must conclusively resolve a matter separate from the main action.  This order does not.

---

[11]  Robert's opening brief raises no independent legal argument directed at the enforcement order specifically.  Instead, he treats the September 11, 2024 order and the enforcement order as one, seeking derivative relief contingent on the success of his challenges to the support arrears and attorney's fees.  That is not an adequate legal argument.  Robert has accordingly abandoned any challenge to the enforcement order, and our analysis is confined to the September 11, 2024 order.

17.

The characterization of the liquidated RSU is only one component of the final division of assets. The trial court must still value the community estate as a whole, divide it equally under section 2550, and balance the parties' awards through equalization payments, reimbursement claims, and credits. (See § 2550 ["the court shall, … divide the community estate of the parties equally"].)

Generally, interim orders characterizing or dividing individual marital assets are not appealable when the final property judgment remains pending. (See, e.g. *In re Marriage of Lafkas* (2007) 153 Cal.App.4th 1429, 1433 [finding a bifurcated family court order concerning one asset non-appealable because it was "merely preliminary to a final order characterizing, valuing, and dividing all the marital assets"]; *Grimes & Mou, supra*, 45 Cal.App.5th at pp. 410, 419 [a family court order characterizing and dividing assets in a brokerage account was not appealable where the final property judgment had not yet been entered].) Although there are exceptions to this rule, those exceptions do not apply here.[12]

Second, the plain language of the order demonstrates that it is not final. The trial court's order provides that the $172,224 payment "is to be attributed to [Leigh] *at the time of trial*." (Italics added.) That language confirms the order does not conclude the parties'

---

[12] A party may request that the trial court separately try the characterization of an asset if "resolution of the bifurcated issue is likely to simplify the determination of the other issues." (Cal. Rules of Court, rule 5.390(b), (b)(4).) The party may then request that the court certify the resulting order for immediate appellate review. (*Id*., rule 5.392(b)–(c) [authorizing the family court to issue a certificate of probable cause for an interlocutory issue].) "If the certificate is granted, a party may ... file in the Court of Appeal a motion to appeal the decision on the bifurcated issue." (*Id*., rule 5.392(d).) However, the failure to seek or obtain appellate review of the decision on the bifurcated issue does not preclude review of the decision upon appeal of the final judgment. (*Id.* rule 5.392(h).)

The record contains no indication that Robert sought to bifurcate the characterization of the RSUs or to certify any order under these rules. The rule 5.392 procedure is the established route for obtaining appellate review of a characterization ruling before final judgment, and Robert's failure to invoke it confirms that the order is not independently appealable. A partial judgment on reserved issues, which would support appellate jurisdiction, requires entry of a separate signed judgment (Cal. Rules of Court, rule 5.411) and none was entered here.

18.

rights. Rather, it advances a portion of the community assets to Leigh subject to a final reconciliation at trial. An order that leaves the parties' ultimate rights subject to revision at a later proceeding is not final and not appealable. (*In re Marriage of Freitas* (2012) 209 Cal.App.4th 1059, 1074.)

Because the order addressing the liquidated tranche of RSUs is not appealable, we do not have jurisdiction to reach the merits of Robert's challenge to the trial court's order on this asset. We therefore dismiss this portion of his appeal.

III.    DETERMINATION OF THE TEMPORARY SUPPORT ARREARAGES

Robert asserts that the temporary support arrears order is not supported by substantial evidence. As to the 2022 and 2023 arrears, Robert stipulated that the total amount owed of $96,156.69. However, he disputed Leigh's attorney's calculation of the 2024 arrears total because it included a $54,000 long-term incentive. The parties' counsel asked the court to reserve jurisdiction on the characterization of that asset as well as the RSUs pending trial, which the court agreed to do.

We conclude that the parties' stipulation forecloses Robert's challenge to the $142,002.69 arrears total owed by him.

*A.  Background*

Following a hearing on August 31, 2022, the trial court issued findings and order after hearing directing Robert to pay $4,423 a month in child support and $4,891 a month for spousal support, for a total monthly baseline support obligation of $9,314. The court also ordered Robert to pay Leigh a percentage of any income exceeding his base income pursuant to an *Ostler-Smith* order. The court's temporary support order, subsequently made retroactive to January 15, 2022, was never appealed.

On August 30, 2023, Leigh filed a request for order to enforce the temporary support order, asserting that Robert owed additional support payments under the *Ostler-Smith* formula based on his reported bonuses in 2022 and 2023.

On August 27, 2024, the trial court addressed the temporary support arrears. Leigh's trial counsel submitted Robert's W-2 for 2022, and paystubs for 2023 and 2024 reflecting his year-to-date income. The parties agreed that the arrears totaled $78,564.69 for 2022, $17,592 for 2023, and $60,846 for 2024. The 2024 figure included a "$54,000" long-term incentive.[13] The parties also agreed that a $15,000 credit applied for a payment Robert had made in November 2023. In total, these figures represented $142,002.69 in alleged support arrears.

Leigh's trial counsel explained that the $142,002.69 support arrears total excludes RSU vesting proceeds from Robert's income. She explained, if the RSUs are ultimately characterized as community property, they will be divided as property, making their exclusion from the $142,002.69 arrears accurate. Alternatively, if the RSUs are ultimately characterized as Robert's separate property, then Leigh would be entitled to *Ostler-Smith* payments based on the following amounts: $4,596.59 for earnings on restricted stock FED and $103,656.85 for earnings on restricted SUB in 2022; $24,037.44 for restricted stock FED and $236,987.52 earnings on restricted SUB for 2023; and $357,772.79 in earnings for restricted stock FED and $1,007,001.40 earnings on restricted stock FED for up to May 10, 2024.

Robert's trial counsel agreed with the arrears calculated for 2022 and 2023, as well as the application of a $15,000 credit, but observed that the 2024 figure was not a true year-end calculation. He further claimed that the May 2024 total improperly includes an additional $200,000 in bonus income on which Robert had already made an *Ostler-Smith* payment, along with a $54,000 long-term incentive on which Robert is taxed as a reserve share. He

---

[13] The precise value of the long-term incentive reflected on Robert's May 10, 2024 paystub is $54,734.85. We refer to the value as $54,000 throughout this opinion however because it is consistent with the manner in which the parties and the court referred to the incentive.

requested the court retain jurisdiction to determine the proper characterization of the $54,000 long-term incentive.

The court reviewed Robert's paystubs and W-2, performed its own calculations under the *Ostler-Smith* formula, and agreed that the total arrears were $142,002.69.[14] It clarified this figure assumes the RSUs are community property, which would require their exclusion from the support arrears as income. If the RSUs are later characterized as Robert's separate property, Leigh would be entitled to an *Ostler-Smith* payment based on their value. The court ordered Robert to pay Leigh $142,002.69 in temporary support arrears, which included the $54,000 long-term incentive, but expressly reserved for trial characterization of both the long-term incentive and the RSUs.

On September 11, 2024, the court issued its findings and order after hearing. As relevant here, the order provides the following:

> "1. Arrears Order: The Court finds and orders the Respondent owes arrears for the Ostler-Smith support order in the amount of $142,002.69 for the period up through May 2024, *as long as* the Restricted Stock Units are deemed Community Property. This amount is to be paid by [Robert] to [Leigh] forthwith. [¶] … [¶]
>
> 4. The Court further reserves for determination long-term incentive pay in the amount of $54,000, 'remaining in' the calculation for *Ostler-Smith*." (Italics added.)

On October 2, 2024, the trial court issued another findings and orders after hearing ordering Robert to make a one-time withdrawal from the restricted stock account to pay amounts owed under the order to Leigh, which would be allocated to Robert at trial.

---

[14] Robert's 2022 W-2 and 2023 and 2024 paystubs were made part of the record. However, the way the parties and the lower court arrived at the agreed-upon support arrears totals was never explicitly set forth in the record.

*B. Appealability*

As distinct from the order directing Robert to pay Leigh one-half of the value of the liquidated RSUs, an order fixing the amount of unpaid arrears under a temporary support order is appealable. (Code Civ. Proc., § 904.1, subd. (a)(10); Fam. Code, § 3554.)

*C. Background on Temporary Support and Arrears Where Supporting Party Has Income from Bonuses*

During dissolution proceedings, the trial court may award temporary spousal support in "any amount" based on the requesting party's need and the supporting party's ability to pay. (§ 3600; *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 159.) Temporary support serves a different function from permanent spousal support; where permanent support reflects the parties' postdissolution financial circumstances, temporary support is designed to maintain the marital status quo pending trial and division of assets. (*In re Marriage of Winter* (1992) 7 Cal.App.4th 1926, 1932.)

The court is not restricted by any statutory formula in setting a temporary support amount. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 312.) The court instead exercises broad discretion to consider the "big picture" of the parties' assets and income against the marital standard of living. (*In re Marriage of Dick, supra*, 15 Cal.App.4th at p. 167.) Because a party's ability to pay encompasses more than earned income, the court may consider investments and other assets. (*Id*. at p. 159.)

Temporary child support orders, by contrast, must adhere to the state uniform child support guidelines. (§ 4052.) Guideline support is based on the parents' net monthly income (§ 4055, subd. (b)), and income is broadly defined to include "income from whatever source derived." (§ 4058, subd. (a)). Because some individuals earn a significant portion of their income through bonuses and other variable compensation, support orders may include an *Ostler-Smith* provision authorizing " 'an additional award, over and above guideline support' " to capture fluctuations in the supporting spouse's income. (*In re Marriage of Minkin, supra,* 11 Cal.App.5th at p. 949.)

22.

*D. Analysis*

The baseline temporary support award of $9,314 per month is not in dispute. The parties' arguments concern only the temporary support arrears awarded following the August 27, 2024 hearing. Our analysis is therefore constrained to the arrears totals based on Robert's *Ostler-Smith* support obligation, which depends on the scope and validity of the parties' stipulation.

At the August 27, 2024 hearing, the parties stipulated that Robert's total arrears were $78,564.69 for 2022, and $17,592.00 for 2023. They further agreed that Robert's year-to-date arrears for 2024 included a $54,000 long-term incentive, while reserving for trial the characterization of the RSUs and the long-term incentive. In other words, although the parties reserved for later determination whether the long-term incentive constituted income subject to *Ostler-Smith* support, they nonetheless stipulated to a provisional arrears figure of $142,002.69 pending final characterization, with any necessary reconciliation to occur at trial. The arrears figures, totaling $142,002.69, were calculated based on Robert's 2022 W-2 and his year-to-date earnings reflected on his 2023 and 2024 paystubs, all of which are part of the record on appeal. We see no reason the parties should not be bound by their stipulation.

" ' "A stipulation is '[a]n agreement between opposing counsel … ordinarily entered into for the purpose of avoiding delay, trouble, or expense in the conduct of the action,' [citation] and serves 'to obviate need for proof or to narrow [the] range of litigable issues.' " ' " (*In re Marriage of Jackson* (2006) 136 Cal.App.4th 980, 991.) The stipulation here was made orally before the court during a contested hearing on a discrete issue, and is reflected in both the minute order and the settled statement certified by the trial court. The minute order upon which Robert relies confirms that his trial counsel agreed to the $54,000 long term incentive remaining in the arrears calculation, while its characterization would be reserved for trial.

Robert does not argue that counsel exceeded his authority by entering into the stipulation here, nor does the record independently support such a conclusion. (*Knabe v. Brister* (2007) 154 Cal.App.4th 1316, 1324 [if a client can demonstrate a lack of authorization and his lawyer stipulates to a substantial portion of the case or a fundamental right of the client, it is appropriate to set aside that stipulation], but see *In re Marriage of Helsel* (1988) 198 Cal.App.3d 332, 339–340 [distinguishing civil litigation, where counsel's stipulation often disposes of the case, from family law, where stipulations often resolve only discrete issues and may have less impact on the client's substantial rights].)

Nor did Robert move in the trial court to set aside the stipulation on the ground that counsel exceeded his authority by entering it. The first challenge to the stipulation came when Robert obtained new representation and filed his notice of appeal. The proposed settled statement prepared by Robert's appellate counsel avoided use of the word "stipulation" with respect to the temporary support arrears totals. However, the trial court ultimately rejected appellate counsel's proposed statement, and the stipulation remained in the settled statement certified by the court.[15] Whatever the disagreement appellate counsel later expressed, the settled statement certified by the trial court reflects a stipulation to the $142,002.69 figure, including the disputed long-term incentive pending later characterization. We are bound by that record.

Absent a successful challenge to the validity or scope of the stipulation, Robert may not contest on appeal the sufficiency of the evidence supporting arrears figures to which his

[15] In the appellant's proposed settled statement, he asserted: "Mr. Bridges' attorney also informed the court that Mr. Bridges was not agreeing to the $142,002.69 arrears calculation; he agreed to pay $88,000 in arrears from 2022 and 2023, but he was disputing $54,000 tied to a long-term incentive Mr. Bridges received as separate property."

The trial court ultimately certified the following summary: "The parties Counsel stipulate and agree that the support arrears according to the Ostler Smith Order are currently $142,002.69 and additionally $344,448.00 of restricted stock units were cashed in by [Robert], half of which is owed to [Leigh]."

counsel expressly agreed.  The parties' stipulation therefore forecloses Robert's challenge to the arrears total on appeal.

Robert's challenge to the inclusion of the $54,000 long-term incentive in the 2024 arrears fails for the same reason.  He affirmatively agreed to its inclusion in the temporary support arrears owed to Leigh, pending the court's characterization of that asset at trial.

Robert observes that the parties' stipulation to the arrears totals is not referenced in the court's findings and order after hearing, and therefore, argues it should not be given effect.  He invokes section 1003 of the Code of Civil Procedure and *In re Marriage of Drake*, for the proposition that only the written order is the effective order.  (Code Civ. Proc., § 1003 ["Every direction of a court or judge, made or entered in writing, and not included in a judgment, is denominated an order"]; *In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1170 ["the trial court may properly file a written order differing from its oral rulings when the rulings have not been entered in the minutes of the court.  [Citation.] Furthermore, when the trial court's minutes expressly indicates that a written order will be filed, only the written order is the effective order."].)

There is no oral-versus-written controversy to resolve here.  The trial court's order is consistent with the parties' stipulation, which is reflected both in the minute order from the contested hearing and the settled statement certified by the court.  The absence of an express recital of the stipulation in the findings and order after hearing does not undermine the parties' agreement.

To the extent Robert contends that the lack of a reporter's transcript renders the oral stipulation problematic, his own failure to secure a court reporter fails to support a claim of reversible error on appeal.

Robert further contends the trial court's order is contradictory because "it expressly states that the court reserved 'for determination [the] long-term incentive pay in the amount of $54,000.00,' yet it ordered Robert to pay Leigh $142,002.69 in arrears—a figure which was calculated using the $54,000.00 long-term incentive."  Although the order is not a

model of clarity, it is reasonably understood as preserving the characterization issue while requiring payment of the provisional arrears amount pending reconciliation.

Given the complexity of this case, and the difficulty of calculating temporary support arrears on assets with unresolved characterization, the parties reached a practical interim resolution: compute the temporary support arrears on the bonus income base both sides accepted, reserve jurisdiction on the underlying character of the long-term incentive and the RSUs, and complete any necessary reconciliation at trial. This sequencing preserves Robert's ability to seek a credit if the long-term incentive is ultimately characterized in a manner inconsistent with the provisional arrears calculation.[16] The remedy for any later recharacterization therefore lies in the trial court, not on appeal.

We conclude that the parties' stipulation to the arrears totals at the August 27, 2024 hearing forecloses Robert's substantial evidence challenge on appeal. Robert's assertions to the contrary are unpersuasive.

IV.     ATTORNEY'S FEES

The trial court awarded Leigh attorney's fees, finding a disparity in access to funds and that the fees were reasonable under sections 2030 and 2032. Robert contends the trial court abused its discretion by ordering him to pay attorney's fees in the amount of $159,669.44, with a credit of $25,000. We find no error.

---

**16**     As Robert acknowledges, the existing record does not permit characterization of the RSUs without further evidence. It does not, for example, establish when the RSUs vest or how many of the tranches are currently vested. He posits that based upon a presumptive vesting term of three years, some of the RSU tranches will be community property, some will be a mixture of community and separate property, while other tranches granted after the date of separation would be Robert's separate property. Given the complexity of the characterization of these assets, he suggests that a forensic accountant may be required.

That complexity is precisely why the court, in conformity with the parties' request, reserved jurisdiction over the RSUs and the long-term incentive credit.

*A. Background*

Leigh's current trial counsel was retained sometime before March 29, 2023. On May 24, 2023, she requested $85,000 in attorney's fees, supported by her income and expense declaration made and filed by Leigh. The fee request was based upon attorney's fees of $35,000 from the beginning of representation until the filing of the request, and $50,000 in estimated attorney's fees and costs.

Robert requested that each party to be responsible for their own attorney's fees and costs, reciting the money already awarded to Leigh in temporary support. He further asserted that following liquidation or equalization of the assets, Leigh would have enough money to pay her own attorney's fees and costs.

On October 3, 2023, the trial court ordered Robert to pay Leigh $25,000 in attorney's fees. Robert subsequently paid this amount.

On August 14, 2024, Leigh requested attorney's fees and costs totaling approximately $159,669.44.[17] The request was supported by an amended declaration by Leigh's attorney, stating her hourly billing rate as well as the billing rate of her associate, that the case was complex in nature due to custody, visitation, spousal support, domestic violence, and the millions of dollars in assets at issue, and the motions, court appearances, and preparation for court appearances involved.

Robert opposed the request, arguing the fees were excessive and unsupported by the record. According to Robert, he had only incurred $65,000 in attorney's fees for his retained counsel to date.

The trial court awarded Leigh's requested attorney's fees, less Robert's prior payment of $25,000. In so doing, it made the following findings in its written ruling:

---

[17] This total did not credit the $25,000 Robert had already paid.

### 1. *Financial Disparity and Ability to Pay*

A significant financial disparity exists between the parties regarding access to funds for legal representation. Robert possesses greater financial resources, having liquidated over $1,000,000 in restricted stock options and earning $1,747,095.59 through May 10, 2024. Leigh, in contrast, is unemployed and lacks independent access to funds without court intervention.

### 2. *Case Complexity and Legal Work Required*

The dissolution proceeding, filed November 9, 2021, involves a 17-plus year marriage and presents exceptional complexity. The case encompasses standard dissolution issues plus domestic violence matters requiring a restraining order. Leigh has filed numerous requests for orders and orders to show cause, necessitating extensive court appearances and discovery work requiring skilled, experienced litigation counsel.

### 3. *Respondent's Misconduct*

Robert violated automatic restraining orders by improperly transferring, encumbering, or disposing of marital property without written consent or court authorization, warranting financial consequences.

### 4. *Petitioner's Circumstances*

Leigh has been unemployed since 2006, dedicating time to domestic duties during the marriage. She lacks marketable skills necessary to obtain employment sufficient to cover litigation expenses and requires retraining to develop employable skills.

### 5. *Domestic Violence History*

A permanent restraining order has been issued against Robert based on documented domestic violence between the parties.

### A. *APPLICABLE LAW AND STANDARD OF REVIEW*

Sections 2030 and 2032 authorize the court in an enforcement action to "award fees and costs between the parties based on their relative circumstances in order to ensure parity of legal representation in the action." (*In re Marriage of Falcone & Fyke* (2012) 203

28.

Cal.App.4th 964, 974, fn. omitted.) Under subdivision (a)(2) of section 2030, "[i]f the findings demonstrate disparity in access [to funds] and ability to pay, the court shall make an order awarding attorney's fees and costs." (*Ibid.*)

The word "shall" reflects the mandatory nature of these provisions where a court makes a finding of relative disparity. (*In re Marriage of Morton* (2018) 27 Cal.App.5th 1025, 1050; see also § 12 [when used in the Family Code, " '[s]hall' is mandatory and 'may' is permissive"].) Thus, it is no longer the case that fee awards in these circumstances are left to the family court's "sound" or "broad" discretion. (*In re Marriage of Morton*, at p. 1049; *In re Marriage of Knox* (2022) 83 Cal.App.5th 15, 25.)

"When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties." (§ 2030, subd. (a)(2).) An award of fees is limited to the amount "reasonably necessary" to maintain or defend the proceeding (§ 2030, subd. (a)(1)) and must be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).)

Under subdivision (b) of section 2032, "[i]n determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in section 4320." (*Ibid.*) In determining one party's relative need and the other party's ability to pay, "the family court may consider all evidence concerning the parties' current incomes, assets, and abilities, including investment and income-producing properties." (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 662.)

The trial court's decision whether to award need-based attorney's fees under sections 2030 and 2032 requires that it "resolve questions of law, make findings of fact, and exercise

29.

discretionary authority to resolve certain issues. Each of these aspects of the [trial] court's decision is subject to a different standard of review." (*In re Marriage of Knox*, *supra*, 83 Cal.App.5th at p. 25.) We review questions of law de novo, factual findings for substantial evidence, and discretionary determinations for abuse of that discretion. (*Ibid.*)

As always, the trial court's decision is "presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.) In addition, we will not reverse by reason of any error by the trial court unless the record shows the error was prejudicial and a different result would have been probable absent the error. (*In re E.M.* (2014) 228 Cal.App.4th 828, 852.)

*B. Analysis*

Robert maintains that the amount of the attorney's fees award was unreasonable, particularly compared to his own attorney's fees. His argument fails for three reasons.

First, the complexity of this case cannot be understated. The instant proceeding involved the dissolution of a marriage of 17-plus years and culminated in the issuance of a five-year domestic violence restraining order following a contested hearing. The parties disputed the characterization of Robert's RSUs, the scope of his earnings subject to *Ostler-Smith*, and the resulting temporary support arrears. But the underlying litigation required multiple contested hearings, and extensive discovery and motion practice. Fees commensurate with that scope of work are not unreasonable on their face.

Second, Robert's premise, that Leigh's attorney's fees are excessive because they exceed his own, assumes that the parties faced equivalent litigation tasks. They did not. A party seeking a domestic violence restraining order, seeking temporary support arrears, and enforcement of arrears bears a fundamentally different workload than a party opposing those efforts. Leigh, for example, bore the cost of marshalling the evidence documenting Robert's post-TRO contacts, spanning multiple years. She prepared and prosecuted the requests for order that produced the August 27, 2024 hearing. By contrast, Robert was largely in a

30.

defensive posture, responding to Leigh's filings rather than initiating them. A side-by-side comparison of fee totals does not account for that disparity.

Moreover, the relevant inquiry is whether Leigh's fees are unreasonable for the work her attorney performed, not whether they match Robert's. (§ 2032, subd. (b) [fees must be "just and reasonable under the relative circumstances of the respective parties"].) A bare comparison of totals does not establish unreasonableness.

Finally, to the extent that Robert observes that the record contains no explanation for Leigh's attorney's fees, California law does not require a particular level of detail in time to support an attorney's fees request. It does not require billing or time records at all. (See, e.g., *Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 63–64 [affirming fees awarded based on a single declaration by counsel describing work done by other attorneys]; *Margolin v. Regional Planning Commission* (1982) 134 Cal.App.3d 999, 1007 [attorney's declaration describing work of another attorney for which "no time records were kept" accepted as a basis for a fee award]; *In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 301 ["In many cases the trial court will be aware of the nature and extent of the attorney's services from its observation of the trial proceedings and the pretrial and discovery proceedings reflected in the file"].) Direct evidence of the reasonable value of an attorney's services therefore need not be introduced "because such evidence is necessarily before the trial court which hears the case." (*Frank v. Frank* (1963) 213 Cal.App.2d 135, 137.)[18]

Based on the foregoing, we conclude that substantial evidence supports the fee award.

---

[18] We further observe that although Robert challenges the computation of Leigh's attorney's fees on appeal, he fails to direct us portions of the record where he requested an explicit finding on this point below. (Code Civ. Proc., § 634 [a party must state any objections to statement of decision in order to avoid implied finding on appeal in favor of prevailing party].)

## DISPOSITION

The trial court's order entered on August 27, 2024, is affirmed. The order entered on September 20, 2024, is affirmed as to the awards of $142,002.69 in temporary support arrears and $159,669.44 in attorney's fees. The appeal from the September 20, 2024 order is dismissed as to the $172,224 community property credit for liquidated RSUs. The appeal from the order entered on October 2, 2024, is dismissed as abandoned. Leigh is awarded costs on appeal.

FRANSON, J.

**WE CONCUR:**

DETJEN, Acting P. J.

HARRELL, J.

32.